**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NAVAJO NATION; HAVASUPAI TRIBE; REX TILOUSI; DIANNA UQUALLA; SIERRA CLUB; WHITE MOUNTAIN APACHE NATION; YAVAPAI-APACHE NATION; THE FLAGSTAFF ACTIVIST NETWORK,

*Plaintiffs-Appellants,*

and

HUALAPAI TRIBE; NORRIS NEZ; BILL BUCKY PRESTON; HOPI TRIBE; CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiffs,*

v.

UNITED STATES FOREST SERVICE; NORA RASURE, in her official capacity as Forest Supervisor, Responsible Officer, Coconino National Forest; HARV FORSGREN, appeal deciding office, Regional Forester, in his official capacity,

*Defendants-Appellees,*

ARIZONA SNOWBOWL RESORT LIMITED PARTNERSHIP,

*Defendant-intervenor-Appellee.*

No. 06-15371

D.C. Nos.
CV-05-01824-PGR
CV-05-01914-PGR
CV-05-01949-PGR
CV-05-01966-PGR

NAVAJO NATION; HUALAPAI TRIBE;
NORRIS NEZ; BILL BUCKY PRESTON;
HAVASUPAI TRIBE; REX TILOUSI;
DIANNA UQUALLA; SIERRA CLUB;
WHITE MOUNTAIN APACHE NATION;
YAVAPAI-APACHE NATION; CENTER
FOR BIOLOGICAL DIVERSITY; THE
FLAGSTAFF ACTIVIST NETWORK,
                    *Plaintiffs,*

              and

HOPI TRIBE,
                *Plaintiffs-Appellant,*

              v.

UNITED STATES FOREST SERVICE;
NORA RASURE, in her official
capacity as Forest Supervisor,
Responsible Officer, Coconino
National Forest; HARV FORSGREN,
appeal deciding office, Regional
Forester, in his official capacity,
                *Defendants-Appellees,*

ARIZONA SNOWBOWL RESORT
LIMITED PARTNERSHIP,
       *Defendant-intervenor-Appellee.*

No. 06-15436

D.C. Nos.
CV-05-01824-PGR
CV-05-01914-PGR
CV-05-01949-PGR
CV-05-01966-PGR

HUALAPAI TRIBE; NORRIS NEZ; BILL
BUCKY PRESTON,
                    *Plaintiffs-Appellants,*

                    v.

UNITED STATES FOREST SERVICE;
NORA RASURE, in her official
capacity as Forest Supervisor,
Responsible Officer, Coconino
National Forest; HARV FORSGREN,
appeal deciding office, Regional
Forester, in his official capacity,
                    *Defendants-Appellees.*

No. 06-15455
D.C. No.
CV-05-01824-PGR
OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
September 14, 2006—San Francisco, California

Filed March 12, 2007

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Thelton E. Henderson,* District Judge.

Opinion by Judge William A. Fletcher

---

   *The Honorable Thelton E. Henderson, Senior United States District
Judge for the Northern District of California, sitting by designation.

**COUNSEL**

Howard M. Shanker, Tempe, Arizona; William Curtis Zukosky, DNA People's Legal Services, Flagstaff, Arizona; Terence M. Gurley, DNA People's Legal Services, Window Rock, Arizona; Laura Lynn Berglan, DNA People's Legal Services, Tuba City, Arizona; Anthony S. Canty, Lynelle Kym Hartway, The Hopi Tribe, Kykotsmovi, Arizona, for the appellants.

Rachael Dougan, Lane McFadden, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Janice M. Schneider, Bruce Babbitt, Latham & Watkins, Washington, D.C.; Philip A. Robbins, Paul G. Johnson, Jennings Strouss & Salmon, Phoenix, Arizona, for the appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

The San Francisco Peaks in the Coconino National Forest in northern Arizona have long-standing religious significance to numerous Indian tribes of the American Southwest. The Arizona Snowbowl is a ski area on Humphrey's Peak, the highest and most religiously significant of the San Francisco

Peaks. After preparing an Environmental Impact Statement, the United States Forest Service approved a proposed expansion of the Snowbowl's facilities. One component of the expansion would enable the Snowbowl to make artificial snow from recycled sewage effluent. Plaintiffs challenged the Forest Service's approval of the expansion under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*

After a bench trial, the district court held that the proposed expansion did not violate RFRA. *Navajo Nation v. U.S. Forest Serv.*, 408 F. Supp. 2d 866, 907 (D. Ariz. 2006). At the same time, the district court granted summary judgment to the defendants on the plaintiffs' NEPA and NHPA claims. *Id.* at 872-80. This appeal followed as to all three claims.

Plaintiffs-appellants are the Navajo Nation, the Hopi Tribe, the Havasupai Tribe, the Hualapai Tribe, the Yavapai-Apache Nation, the White Mountain Apache Nation, Bill Bucky Preston (of the Hopi Tribe), Norris Nez (of the Navajo Nation), Rex Tilousi (of the Havasupai Tribe), Dianna Uqualla (of the Havasupai Tribe), the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network. Defendants-appellees are the United States Forest Service; Nora Rasure, the Forest Supervisor; Harv Forsgren, the Regional Forester; and intervenor Arizona Snowbowl Resort Limited Partnership ("ASR"), the owner of the Snowbowl.

We reverse the decision of the district court in part. We hold that the Forest Service's approval of the Snowbowl's use of recycled sewage effluent to make artificial snow on the San Francisco Peaks violates RFRA, and that in one respect the Final Environmental Impact Statement prepared in this case does not comply with NEPA. We affirm the grant of summary judgment to Appellees on four of Appellants' five NEPA claims and their NHPA claim.

## I.   Background

Humphrey's Peak, Agassiz Peak, Doyle Peak, and Fremont Peak form a single large mountain commonly known as the San Francisco Peaks, or simply the Peaks. The Peaks tower over the desert landscape of the Colorado Plateau in northern Arizona. At 12,633 feet, Humphrey's Peak is the highest point in the state. The Peaks are located within the 1.8 million acres of the Coconino National Forest.

In 1984, Congress designated 18,960 acres of the Peaks as the Kachina Peaks Wilderness. Arizona Wilderness Act of 1984, Pub. L. No. 98-406, § 101(a)(22), 98 Stat. 1485. The Forest Service has identified the Peaks as eligible for inclusion in the National Register of Historic Places and as a "traditional cultural property." A traditional cultural property is one "associat[ed] with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." National Register Bulletin 38: *Guidelines for Evaluating and Documenting Traditional Cultural Properties* (rev. ed. 1998), *available at* http:// www.cr.nps.gov/nr/publications/bulletins/nrb38/.

The Forest Service has described the Peaks as "a landmark upon the horizon, as viewed from the traditional or ancestral lands of the Hopi, Zuni, Acoma, Navajo, Apache, Yavapai, Hualapai, Havasupai, and Paiute." The Service has acknowledged that the Peaks are sacred to at least thirteen formally recognized Indian tribes, and that this religious significance is of centuries' duration. Though there are differences among these tribes' religious beliefs and practices associated with the Peaks, there are important commonalities. As the Service has noted, many of these tribes share beliefs that water, soil, plants, and animals from the Peaks have spiritual and medicinal properties; that the Peaks and everything on them form an indivisible living entity; that the Peaks are home to deities and other spirit beings; that tribal members can communicate with

higher powers through prayers and songs focused on the Peaks; and that the tribes have a duty to protect the Peaks.

Organized skiing has existed at the Arizona Snowbowl since 1938. The original lodge was destroyed by fire in 1952. A replacement lodge was built in 1956. A poma lift was installed in 1958, and a chair lift was installed in 1962. In 1977, the then-owner of the Snowbowl requested authorization to clear 120 acres of new ski runs and to do additional development. In 1979, after preparing an Environmental Impact Statement, the Forest Service authorized the clearing of 50 of the 120 requested acres, the construction of a new lodge, and some other development. An association of Navajo medicine men, the Hopi tribe, and two nearby ranch owners brought suit under, *inter alia*, the Free Exercise Clause of the First Amendment and NEPA. The D.C. Circuit upheld the Forest Service's decision. *Wilson v. Block*, 708 F.2d 735 (D.C. Cir. 1983).

The Snowbowl has always depended on natural snowfall. In dry years, the operating season is short, with few skiable days and few skiers. The driest year in recent memory was 2001-02, when there were 87 inches of snow, 4 skiable days, and 2,857 skiers. Another dry year was 1995-96, when there were 113 inches of snow, 25 skiable days, and 20,312 skiers. By contrast, in wet years, there are many skiable days and many skiers. For example, in 1991-92, there were 360 inches of snow, 134 skiable days, and 173,000 skiers; in 1992-93, there were 460 inches of snow, 130 skiable days, and 180,062 skiers; in 1997-98, there were 330 inches of snow, 115 skiable days, and 173,862 skiers; and in 2004-05, there were 460 inches of snow, 139 skiable days, and 191,317 skiers.

ASR, the current owner, purchased the Snowbowl in 1992 for $4 million. In September 2002, ASR submitted a facilities improvement proposal to the Forest Service. In February 2004, the Forest Service issued a Draft Environmental Impact Statement. A year later, in February 2005, the Forest Service

issued a Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD"). The ROD approved "Alternative Two" of the FEIS, the alternative preferred by the Snowbowl. Under Alternative Two, a number of changes were proposed, including: an area for snow play and snow tubing would be developed; a new high-speed ski lift would be added; three existing lifts would be relocated and upgraded; 66 new acres of skiable terrain would be developed; 50 acres of trails would be re-contoured; a three-acre beginner's area would be re-contoured and developed; an existing lodge would be upgraded; and a new lodge would be built.

Alternative Two also included a proposal to make artificial snow using treated sewage effluent. Treated sewage effluent is wastewater discharged by households, businesses, and industry that has been treated for certain kinds of reuse. Under Alternative Two, the City of Flagstaff would provide the Snowbowl with up to 1.5 million gallons per day of its treated sewage effluent from November through February. A new 14.8-mile pipeline would be built between Flagstaff and the Snowbowl to carry the treated effluent. At the beginning of the ski season, during November and December, the Snowbowl would cover 205.3 acres of Humphrey's Peak with artificial snow to build a base layer. The Snowbowl would then make additional artificial snow as necessary during the rest of the season, depending on the amount of natural snow.

## II.   Standards of Review

Following a bench trial, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004).

We review *de novo* a grant of summary judgment. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 804 (9th Cir. 1999). Appellants bring their NEPA and NHPA claims under the Administrative Procedure Act ("APA"),

which provides that courts shall "hold unlawful and set aside agency action, findings, and conclusions of law" that are either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## III.   Religious Freedom Restoration Act

**[1]** Under the Religious Freedom Restoration Act of 1993 ("RFRA"), the federal government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). "Exercise of religion" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A); *see also id*. § 2000cc-5(7)(B) (further specifying that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise"). Subsection (b) of § 2000bb-1 qualifies the ban on substantially burdening the free exercise of religion. It provides, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

These provisions of RFRA were prompted by two Supreme Court decisions. RFRA was originally adopted in response to the Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). In *Smith*, an Oregon statute denied unemployment benefits to drug users, including Indians who used peyote in religious ceremonies. *Id.* at 890. The Court held that the First Amendment's Free Exercise Clause does not prohibit burdens on religious practices if they are imposed by laws of general applicability, such as the Oregon statute. Characterizing its prior cases striking down generally applicable laws as "hy-

brid" decisions invoking multiple constitutional interests, the Court refused to apply the "compelling government interest" test to a claim brought solely under the Free Exercise Clause. *Id.* at 881-82, 885-86. The Court acknowledged, however, that although the Constitution does not require a compelling interest test in such a case, legislation could impose one. *Id.* at 890.

In RFRA, enacted three years later, Congress made formal findings that the Court's decision in *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." Pub. L. No. 103-141, § 2(a), 107 Stat. 1488, 1488 (1993) (codified at 42 U.S.C. § 2000bb(a)). Congress declared that the purposes of RFRA were "to provide a claim or defense to persons whose religious exercise is substantially burdened by government" and "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." *Id.* § 2(b), 107 Stat. at 1488 (codified at 42 U.S.C. § 2000bb(b)). In this initial version of RFRA, adopted in 1993, Congress defined "exercise of religion" as "exercise of religion under the First Amendment to the Constitution." *Id.* § 5, 107 Stat. at 1489 (codified at 42 U.S.C. § 2000bb-2(4) (1994) (repealed)).

In 1997, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held RFRA unconstitutional as applied to state and local governments because it exceeded Congress's authority under § 5 of the Fourteenth Amendment. *Id.* at 529, 534-35. The Court did not, however, invalidate RFRA as applied to the federal government. *See Guam v. Guerrero*, 290 F.3d 1210, 1220-21 (9th Cir. 2002) (holding RFRA constitutional as applied to the federal government). Three years

later, in response to *City of Boerne*, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. §§ 2000cc *et seq.*). RLUIPA prohibits state and local governments from imposing substantial burdens on the exercise of religion through prisoner or land-use regulations. 42 U.S.C. §§ 2000cc, 2000cc-1. In addition, RLUIPA replaced RFRA's original, constitution-based definition of "exercise of religion" with the broader definition quoted above. RLUIPA §§ 7-8, 114 Stat. at 806-07. Under RLUIPA, and under RFRA after its amendment by RLUIPA in 2000, "exercise of religion" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4), 2000cc-5(7)(A).

In several ways, RFRA provides greater protection for religious practices than did the Supreme Court's pre-*Smith* free exercise cases. First, as we have previously noted, RFRA "goes beyond the constitutional language that forbids the 'prohibiting' of the free exercise of religion and uses the broader verb 'burden': a government may burden religion only on the terms set out by the new statute." *United States v. Bauer*, 84 F.3d 1549, 1558 (9th Cir. 1996) (as amended). *Cf.* U.S. Const. amd. 1 ("Congress shall make no law . . . prohibiting the free exercise [of religion]."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) ("The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.' " (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring))).

Second, as the Supreme Court noted in *City of Boerne*, RFRA provides stronger protection for free exercise than the First Amendment did under the pre-*Smith* cases because "the Act imposes in every case a least restrictive means require-

ment — a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify." 521 U.S. at 535.

Third, RFRA provides broader protection for free exercise because it applies *Sherbert*'s compelling interest test "in all cases" where the free exercise of religion is substantially burdened. 42 U.S.C. § 2000bb(b). Prior to *Smith*, the Court had refused to apply the compelling interest analysis in various contexts, exempting entire classes of free exercise cases from such heightened scrutiny. *Smith*, 494 U.S. at 883 ("In recent years, we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all."); *see, e.g.*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (not applicable to prison regulations); *Bowen v. Roy*, 476 U.S. 693, 707 (1986) (Burger, J., for plurality) (not applicable in enforcing "facially neutral and uniformly applicable requirement for the administration of welfare programs"); *Goldman v. Weinberger*, 475 U.S. 503, 506-07 (1986) (not applicable to military regulations).

Finally, and perhaps most important, Congress expanded the statutory protection for religious exercise in 2000 by amending RFRA's definition of "exercise of religion." Under the amended definition — "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" — RFRA now protects a broader range of religious conduct than the Supreme Court's interpretation of "exercise of religion" under the First Amendment. *See Guru Nanak Sikh Soc'y v. County of Sutter*, 456 F.3d 978, 995 n.21 (9th Cir. 2006) (noting same). To the extent that our RFRA cases prior to RLUIPA depended on a narrower definition of "religious exercise," those cases are no longer good law. *See, e.g.*, *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (burden must prevent adherent "from engaging in conduct or having a religious experience which the faith mandates" and must be "an interference with a tenet or belief that is central to religious doctrine" (quoting *Graham v. Comm'r*, 822 F.2d 844, 850-51 (9th Cir. 1987)); *Stefanow v. McFadden*, 103 F.3d 1466, 1471

(9th Cir. 1996) (no substantial burden because prisoner was not prevented from "engaging in any practices mandated by his religion"); *Goehring v. Brophy*, 94 F.3d 1294, 1299 (9th Cir. 1996) (plaintiffs failed to establish "a substantial burden on a central tenet of their religion"). The district court in this case therefore erred by disregarding the amended definition and requiring Appellants to prove that the proposed action would prevent them "from engaging in conduct or having a religious experience *which the faith mandates*." 408 F. Supp. 2d at 904 (quoting *Worldwide Church of God, Inc. v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000), decided before RLUIPA's passage) (emphasis added).

Even after RLUIPA, RFRA plaintiffs must prove that the burden on their religious exercise is "substantial." The burden must be "more than an 'inconvenience,' " *Guerrero*, 290 F.3d at 1222 (quoting *Worldwide Church of God*, 227 F.3d at 1121), and must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience," *Bryant*, 46 F.3d at 949 (quoting *Graham*, 822 F.2d at 850-51). Thus, in addressing the tribes' RFRA claim we must answer the following questions: (1) What is the "exercise of religion" in which the tribal members engage with respect to the San Francisco Peaks? (2) What "burden," if any, would be imposed on that exercise of religion if the proposed expansion of the Snowbowl went forward? (3) If there is a burden, would the burden be "substantial"? (4) If there would be a substantial burden, can the "application of the burden" to the tribal members be justified as "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest"? We address these questions in turn.

## A.   "Exercise of Religion"

**[2]** RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). The district court

stated that it was not "challenging the honest religious beliefs of any witness." Nor do Appellees dispute the sincerity of Appellants' testimony concerning their religious beliefs and practices. Indeed, Appellees concede that the Peaks as a whole are significant to Appellants' "exercise of religion." We focus our analysis on the Peaks' significance to the Hopi and Navajo, and to a lesser extent on the Hualapai and Havasupai.

### 1.   The Hopi

Hopi religious practices center on the Peaks. As stated by the district court, "The Peaks are where the Hopi direct their prayers and thoughts, a point in the physical world that defines the Hopi universe and serves as the home of the Kachinas, who bring water, snow and life to the Hopi people." 408 F. Supp. 2d at 894. The Hopi have been making pilgrimages to the Peaks since at least 1540, when they first encountered Europeans, and probably long before that.

The Hopi believe that when they emerged into this world, the clans journeyed to the Peaks (or *Nuvatukyaovi*, "high place of snow") to receive instructions from a spiritual presence, *Ma'saw*. At the Peaks, they entered a spiritual covenant with *Ma'saw* to take care of the land, before they migrated down to the Hopi villages. The Hopi re-enact their emergence from the Peaks annually, and Hopi practitioners look to the Peaks in their daily songs and prayers as a place of tranquility, sanctity, and purity.

The Peaks are also the primary home of the powerful spiritual beings called *Katsinam* (Hopi plural of *Katsina*, or Kachina in English). Hundreds of specific *Katsinam* personify the spirits of plants, animals, people, tribes, and forces of nature. The *Katsinam* are the spirits of Hopi ancestors, and the Hopi believe that when they die, their spirits will join the *Katsinam* on the Peaks. As spiritual teachers of "the Hopi way," the *Katsinam* teach children and remind adults of the moral

principles by which they must live. These principles are embodied in traditional songs given by the *Katsinam* to the Hopi and sung by the Hopi in their everyday lives. One Hopi practitioner compared these songs to sermons, which children understand simplistically but which adults come to understand more profoundly. Many of these songs focus on the Peaks.

*Katsinam* serve as intermediaries between the Hopi and the higher powers, carrying prayers from the Hopi villages to the Peaks on an annual cycle. From July through January, the *Katsinam* live on the Peaks. In sixteen days of ceremonies and prayers at the winter solstice, the Hopi pray and prepare for the *Katsinam*'s visits to the villages. In February or March, the *Katsinam* begin to arrive, and the Hopi celebrate with nightly dances at which the *Katsinam* appear in costume and perform. The *Katsinam* stay while the Hopi plant their corn and it germinates. Then, in July, the Hopi mark the *Katsinam*'s departure for the Peaks.

The Hopi believe that pleasing the *Katsinam* on the Peaks is crucial to their livelihood. Appearing in the form of clouds, the *Katsinam* are responsible for bringing rain to the Hopi villages from the Peaks. The *Katsinam* must be treated with respect, lest they refuse to bring the rains from the Peaks to nourish the corn crop. In preparation for the *Katsinam*'s arrival, prayer sticks and feathers are delivered to every member of the village, which they then deposit in traditional locations, praying for the spiritual purity to receive the *Katsinam*. The *Katsinam* will not arrive until the peoples' hearts are in the right place, a state they attempt to reach through prayers directed at the spirits on the Peaks.

The Hopi have at least fourteen shrines on the Peaks. Every year, religious leaders select members of each of the approximately 40 congregations, or *kiva*, among the twelve Hopi villages to make a pilgrimage to the Peaks. They gather from the Peaks both water for their ceremonies and boughs of Douglas fir worn by the *Katsinam* in their visits to the villages.

## 2.   The Navajo

The Peaks are also of fundamental importance to the reli-gious beliefs and practices of the Navajo. The district court found, "[T]he Peaks are considered . . . to be the 'Mother of the Navajo People,' their essence and their home. The whole of the Peaks is the holiest of shrines in the Navajo way of life." 408 F. Supp. 2d at 889. Considering the mountain "like family," the Navajo greet the Peaks daily with prayer songs, of which there are more than one hundred relating to the four mountains sacred to the Navajo. Witnesses described the Peaks as "our leader" and "very much an integral part of our life, our daily lives."

The Navajo creation story revolves around the Peaks. The mother of humanity, called the Changing Woman and com-pared by one witness to the Virgin Mary, resided on the Peaks and went through puberty there, an event which the people celebrated as a gift of new life. Following this celebration, called the *kinaalda*, the Changing Woman gave birth to twins, from whom the Navajo are descended. The Navajo believe that the Changing Woman's *kinaalda* gave them life genera-tion after generation. Young women today still celebrate their own *kinaalda* with a ceremony one witness compared to a Christian confirmation or a Jewish bat mitzvah. The cere-mony sometimes involves water especially collected from the Peaks because of the Peaks' religious significance.

The Peaks are represented in the Navajo medicine bundles found in nearly every Navajo household. The medicine bun-dles are composed of stones, shells, herbs, and soil from each of four sacred mountains. One Navajo practitioner called the medicine bundles "our Bible," because they have "embedded" within them "the unwritten way of life for us, our songs, our ceremonies." The practitioner traced their origin to the Changing Woman: When her twins wanted to find their father, Changing Woman instructed them to offer prayers to the Peaks and conduct ceremonies with medicine bundles.

The Navajo believe that the medicine bundles are conduits for prayers; by praying to the Peaks with a medicine bundle containing soil from the Peaks, the prayer will be communicated to the mountain.

As their name suggests, medicine bundles are also used in Navajo healing ceremonies, as is medicine made with plants collected from the Peaks. Appellant Norris Nez, a Navajo medicine man, testified that "like the western doctor has his black bag with needles and other medicine, this bundle has in there the things to apply medicine to a patient." Explaining why he loves the mountain as his mother, he testified, "She is holding medicine and things to make us well and healthy. We suckle from her and get well when we consider her our Mother." Nez testified that he collects many different plants from the Peaks to make medicine.

The Peaks play a role in every Navajo religious ceremony. The medicine bundle is placed to the west, facing the Peaks. In the Blessingway ceremony, called by one witness "the backbone of our ceremony" because it is performed at all ceremonies' conclusion, the Navajo pray to the Peaks by name.

The purity of nature, including the Peaks, plays an important part in Navajo beliefs. Among other things, it affects how a medicine bundle — described by one witness as "a living basket" — is made. The making of a medicine bundle is preceded by a four-day purification process for the medicine man and the keeper of the bundle. By Navajo tradition, the medicine bundle should be made with leather from a buck that is ritually suffocated; the skin cannot be pierced by a weapon. Medicine bundles are "rejuvenated" regularly, every few years, by replacing the ingredients with others gathered on pilgrimages to the Peaks and three other sacred mountains.

The Navajo believe their role on earth is to take care of the land. They refer to themselves as *nochoka dine*, which one witness translated as "people of the earth" or "people put on

the surface of the earth to take care of the lands." They believe that the Creator put them between four sacred mountains of which the westernmost is the Peaks, or *Do'ok'oos-liid* ("shining on top," referring to its snow), and that the Creator instructed them never to leave this homeland. Although the whole reservation is sacred to the Navajo, the mountains are the most sacred part. One witness drew an analogy to a church, with the area within the mountains as the part of the church where the people sit, and the Peaks as "our altar to the west."

As in Hopi religious practice, the Peaks are so sacred in Navajo beliefs that, as testified by Joe Shirley, Jr., President of the Navajo Nation, a person "cannot just voluntarily go up on this mountain at any time. It's — it's the holiest of shrines in our way of life. You have to sacrifice. You have to sing certain songs before you even dwell for a little bit to gather herbs, to do offerings." After the requisite preparation, the Navajo go on pilgrimages to the Peaks to collect plants for ceremonial and medicinal use.

### 3.   The Hualapai

The Peaks figure centrally in the beliefs of the Hualapai. The Hualapai creation story takes place on the Peaks. The Hualapai believe that at one time the world was deluged by water, and the Hualapai put a young girl on a log so that she could survive. She landed on the Peaks, alone, and washed in the water. In the water, she conceived a son, who was a man born of water. She washed again, and conceived another son. These were the twin warriors or war gods, from whom the Hualapai are today descended. Later, one of the twins became ill, and the other collected plants and water from the Peaks, thereby healing his brother. From this story comes the Hualapai belief that the mountain and its water and plants are sacred and have medicinal properties. One witness called the story of the deluge, the twins, and their mother "our Bible story" and drew a comparison to Noah's ark. As in Biblical parables and

stories, Hualapai songs and stories about the twins are infused with moral principles.

Hualapai spiritual leaders travel to the Peaks to deliver prayers. Like the Hopi and the Navajo, the Hualapai believe that the Peaks are so sacred that one has to prepare oneself spiritually to visit. A spiritual leader testified that he prays to the Peaks every day and fasts before visiting to perform the prayer feather ceremony. In the prayer feather ceremony, a troubled family prays into an eagle feather for days, and the spiritual leader delivers it to the Peaks; the spirit of the eagle then carries the prayer up the mountain and to the creator.

The Hualapai collect water from the Peaks. Hualapai religious ceremonies revolve around water, and they believe water from the Peaks is sacred. In their sweat lodge purification ceremony, the Hualapai add sacred water from the Peaks to other water, and pour it onto heated rocks to make steam. In a healing ceremony, people seeking treatment drink from the water used to produce the steam and are cleansed by brushing the water on their bodies with feathers. At the conclusion of the healing ceremony, the other people present also drink the water. A Hualapai tribal member who conducts healing ceremonies testified that water from the Peaks is used to treat illnesses of "high parts" of the body like the eyes, sinuses, mouth, throat, and brain, including tumors, meningitis, forgetfulness, and sleepwalking. He testified that the Peaks are the only place to collect water with those medicinal properties, and that he travels monthly to the Peaks to collect it from Indian Springs, which is lower on the mountain and to the west of the Snowbowl. The water there has particular significance to the Hualapai because the tribe's archaeological sites are nearby.

In another Hualapai religious ceremony, when a baby has a difficult birth, a Hualapai spiritual leader brings a portion of the placenta to the Peaks so that the child will be strong like the twins and their mother in the Hualapai creation story. The

Hualapai also grind up ponderosa pine needles from the Peaks in sacred water from the Peaks to aid women in childbirth.

A Hualapai religious law forbids mixing the living and the dead. In testimony in the district court, a spiritual leader gave the example of washing a baby or planting corn immediately after taking part in a death ceremony. Mixing the two will cause a condition that was translated into English as "the ghost sickness." The leader testified that purification after "touching death" depends on the intensity of the encounter. If he had just touched the dead person's clothes or belongings, he might be purified in four days, but if he touched a body, it would require a month.

### 4.   The Havasupai

The Peaks are similarly central to the beliefs of the Havasupai, as the Forest Service has acknowledged in the FEIS: "The Hualapai and the Havasupai perceive the world as flat, marked in the center by the San Francisco Peaks, which were visible from all parts of the Havasupai territory except inside the Grand Canyon. The commanding presence of the Peaks probably accounts for the Peaks being central to the Havasupai beliefs and traditions, even though the Peaks themselves are on the edge of their territory." The Chairman of the Havasupai testified that the Peaks are the most sacred religious site of the Havasupai: "That is where life began." The Havasupai believe that when the earth was submerged in water, the tribe's "grandmother" floated on a log and landed and lived on the Peaks, where she survived on water from the Peaks' springs and founded the tribe.

Water is central to the religious practices of the Havasupai. Although they do not travel to the Peaks to collect water, Havasupai tribal members testified that they believe the water in the Havasu creek that they use in their sweat lodges comes ultimately from the Peaks, to which they pray daily. They believe that spring water is a living, life-giving, pure sub-

stance, and they do not use tap water in their religious practices. They perform sweat lodge ceremonies, praying and singing as they use the spring water to make steam; they believe that the steam is the breath of their ancestors, and that by taking it into themselves they are purified, cleansed, and healed. They give water to the dead to take with them on their journey, and they use it to make medicines. The Havasupai also gather rocks from the Peaks to use for making steam.

### B.   "Burden"

The proposed expansion of the Snowbowl entails depositing millions of gallons of treated sewage effluent — often euphemistically called "reclaimed water" — from the City of Flagstaff onto the Peaks. Depending on weather conditions, substantially more than 100 million gallons of effluent could be deposited over the course of the winter ski season.

Before treatment, the raw sewage consists of waste discharged into Flagstaff's sewers by households, businesses, and industry. The FEIS describes the treatment performed by Flagstaff:

> In the primary treatment stage, solids settle out as sludge . . . . Scum and odors are also removed . . . . Wastewater is then gravity-fed for secondary treatment through the aeration/denitrification process, where biological digestion of waste occurs . . . . in which a two-stage anoxic/aerobic process removes nitrogen, suspended solids, and [digestible organic matter] from the wastewater. The secondary clarifiers remove the by-products generated by this biological process, recycle microorganisms back into the process from return activated sludge, and separate the solids from the waste system. The waste sludge is sent to [a different plant] for treatment. The water for reuse then passes through the final sand and anthracite filters prior to disinfection by ultraviolet

light radiation. . . . Water supplied for reuse is fur-
ther treated with a hypochlorite solution to assure
that residual disinfection is maintained . . . .

Although the treated sewage effluent would satisfy the
requirements of Arizona law for "reclaimed water," the FEIS
explains that the treatment does not produce pure water:
"Fecal coliform bacteria, which are used as an indicator of
microbial pathogens, are typically found at concentrations
ranging from 105 to 107 colony-forming units per 100 millili-
ters (CFU/100 ml) in untreated wastewater. Advanced waste-
water treatment may remove as much as 99.9999+ percent of
the fecal coliform bacteria; however, the resulting effluent has
detectable levels of enteric bacteria, viruses, and protazoa,
including Cryptosporidium and Giardia." According to Ari-
zona law, the treated sewage effluent must be free of "detect-
able fecal coliform organisms" in only "four of the last seven
daily reclaimed water samples." Ariz. Admin. Code § R18-
11-303(B)(2)(a). The FEIS acknowledges that the treated
sewage effluent also contains "many unidentified and unregu-
lated residual organic contaminants."

Treated sewage effluent may be safely and beneficially
used for many purposes. *See id.* § R18-11-309 Tbl. A (2005)
(permitting its use for, *inter alia*, irrigating food crops and
schoolyards; flushing toilets; fire protection; certain commer-
cial air conditioning systems; and non-self-service car
washes); 7 Ariz. Admin. Reg. 876 (Feb. 16, 2001) ("Water
reclamation is an important strategy for conserving and aug-
menting Arizona's drinking water supply. Source substitution,
or the reuse of reclaimed water to replace potable water that
currently is used for nonpotable purposes, conserves higher
quality sources of water for human consumption and domestic
purposes."). However, the Arizona Department of Environ-
mental Quality ("ADEQ") requires that users take precautions
to avoid human ingestion. For example, users must "place and
maintain signage . . . so the public is informed that reclaimed
water is in use and that no one should drink from the system."

Ariz. Admin. Code § R18-9-704(H) (2005). Irrigation users must employ "application methods that reasonably preclude human contact with reclaimed water," including preventing "contact with drinking fountains, water coolers, or eating areas," and preventing the treated effluent from "standing on open access areas during normal periods of use." *Id.* § R18-9-704(F). Arizona law prohibits uses involving "full-immersion water activity with a potential of ingestion," and "evaporative cooling or misting." *Id.* § R18-9-704(G)(2).

Under the proposed action challenged in this case, up to 1.5 million gallons per day of treated sewage effluent would be sprayed on the mountain from November through February. In November and December, the Snowbowl would use it to build a base layer of artificial snow over 205.3 acres of Humphrey's Peak. The Snowbowl would then spray more as necessary depending on the amount of natural snowfall. The proposed action also involves constructing a reservoir on the mountain with a surface area of 1.9 acres to hold 10 million gallons of treated sewage effluent. The stored effluent would allow snowmaking to continue after Flagstaff cuts off the supply at the end of February.

The ADEQ approved the use of treated sewage effluent for snowmaking in 2001, noting that four other states already permitted its use for that purpose. 7 Ariz. Admin. Reg. 880 (Feb. 16, 2001). However, the Snowbowl would be the first ski resort in the nation to make its snow entirely from undiluted treated sewage effluent. The Snowbowl's general manager testified in the district court that no other resort in the country currently makes its artificial snow "exclusively" out of undiluted sewage effluent.

Appellants claim that the use of treated sewage effluent to make artificial snow on the Peaks would substantially burden their exercise of religion. Because Appellants' religious beliefs and practices are not uniform, the precise burdens on religious exercise vary among the Appellants. Nevertheless,

the burdens fall roughly into two categories: (1) the inability to perform a particular religious ceremony, because the ceremony requires collecting natural resources from the Peaks that would be too contaminated — physically, spiritually, or both — for sacramental use; and (2) the inability to maintain daily and annual religious practices comprising an entire way of life, because the practices require belief in the mountain's purity or a spiritual connection to the mountain that would be undermined by the contamination.

The first burden — the contamination of natural resources necessary for the performance of certain religious ceremonies — has been acknowledged and described at length by the Forest Service. The FEIS summarizes: "Snowmaking and expansion of facilities, especially the use of reclaimed water, would contaminate the natural resources needed to perform the required ceremonies that have been, and continue to be, the basis for the cultural identity for many of these tribes." Further, "the use of reclaimed water is believed by the tribes to be impure and would have an irretrievable impact on the use of the soil, plants, and animals for medicinal and ceremonial purposes throughout the entire Peaks, as the whole mountain is regarded as a single, living entity."

Three Navajo practitioners' testimony at the bench trial echoed the Forest Service's assessment in describing how the proposed action would prevent them from performing various ceremonies. Larry Foster, a Navajo practitioner who is training to become a medicine man, testified that "once water is tainted and if water comes from mortuaries or hospitals, for Navajo there's no words to say that that water can be reclaimed." He further testified that he objected to the current use of the Peaks as a ski area, but that using treated sewage effluent to make artificial snow on the Peaks would be "far more serious." He explained, "I can live with a scar as a human being. But if something is injected into my body that is foreign, a foreign object — and reclaimed water, in my opinion, could be water that's reclaimed through sewage,

wastewater, comes from mortuaries, hospitals, there could be disease in the waters — and that would be like injecting me and my mother, my grandmother, the Peaks, with impurities, foreign matter that's not natural."

Foster testified that if treated sewage effluent were used on the Peaks he would no longer be able to go on the pilgrimages to the Peaks that are necessary to rejuvenate the medicine bundles, which are, in turn, a part of every Navajo healing ceremony. He explained:

> Your Honor, our way of life, our culture we live in — we live in the blessingway, in harmony. We try to walk in harmony, be in harmony with all of nature. And we go to all of the sacred mountains for protection. We go on a pilgrimage similar to Muslims going to Mecca. And we do this with so much love, commitment and respect. And if one mountain — and more in particularly with the San Francisco Peaks — which is our bundle mountain, or sacred, bundle mountain, were to be poisoned or given foreign materials that were not pure, it would create an imbalance — there would not be a place among the sacred mountains. We would not be able to go there to obtain herbs or medicines to do our ceremonies, because that mountain would then become impure. It would not be pure anymore. And it would be a devastation for our people.

Appellant Navajo medicine man Norris Nez testified that the proposed action would prevent him from practicing as a medicine man. He told the district court that the presence of treated sewage effluent would "ruin" his medicine, which he makes from plants collected from the Peaks. He also testified that he would be unable to perform the fundamental Blessingway ceremony, because "all [medicine] bundles will be affected and we will have nothing to use eventually."

Foster, Nez, and Navajo practitioner Steven Begay testified that because they believe the mountain is an indivisible living entity, the entire mountain would be contaminated even if the millions of gallons of treated sewage effluent are put onto only one area of the Peaks. According to Foster, Nez, and Begay, there would be contamination even on those parts of the Peaks where the effluent would not come into physical contact with particular plants or ceremonial areas. To them, the contamination is not literal in the sense that a scientist would use the term. Rather, the contamination represents the poisoning of a living being. In Foster's words, "[I]f someone were to get a prick or whatever from a contaminated needle, it doesn't matter what the percentage is, your whole body would then become contaminated. And that's what would happen to the mountain." In Nez's words, "All of it is holy. It is like a body. It is like our body. Every part of it is holy and sacred." In Begay's words, "All things that occur on the mountain are a part of the mountain, and so they will have connection to it. We don't separate the mountain."

The Hualapai also presented evidence that the proposed action would prevent them from performing particular religious ceremonies. Frank Mapatis, a Hualapai practitioner and spiritual leader who visits the Peaks approximately once a month to collect water for ceremonies and plants for medicine, testified that the use of treated sewage effluent would prevent him from performing Hualapai sweat lodge and healing ceremonies with the sacred water from the Peaks. Mapatis testified that he believes that the treated sewage effluent would seep into the ground and into the spring below the Snowbowl where he collects his sacred water, so that the spring water would be "contaminated" by having been "touched with death." Because contact between the living and the dead induces "ghost sickness," which involves hallucinations, using water touched with death in healing ceremonies "would be like malpractice." Further, Mapatis would become powerless to perform the healing ceremony for ghost sickness itself, because that ceremony requires water from the Peaks,

the only medicine for illnesses of the upper body and head, like hallucinations.

The second burden the proposed action would impose — undermining Appellants' religious faith, practices, and way of life by desecrating the Peaks' purity — is also shown in the record. The Hopi presented evidence that the presence of treated sewage effluent on the Peaks would fundamentally undermine all of their religious practices because their way of life, or "beliefway," is largely based on the idea that the Peaks are a pure source of their rains and the home of the *Katsinam*.

Leigh Kuwanwisiwma, a Hopi religious practitioner and the director of the tribe's Cultural Preservation Office, explained the connection between contaminating the Peaks and undermining the Hopi religion:

> The spiritual covenant that the Hopi clans entered into with the Caretaker I refer to as Ma'saw, the spiritual person and the other d[ei]ties that reside — and the Katsina that reside in the Peaks started out with the mountains being in their purest form. They didn't have any real intrusion by humanity.
>
> The purity of the spirits, as best we can acknowledge the spiritual domain, we feel were content in receiving the Hopi clans. So when you begin to intrude on that in a manner that is really disrespectful to the Peaks and to the spiritual home of the Katsina, it affects the Hopi people. It affects the Hopi people, because as clans left and embarked on their migrations and later coming to the Hopi villages, we experienced still a mountain and peaks that were in their purest form as a place of worship to go to, to visit, to place our offerings, the tranquility, the sanctity that we left a long time ago was still there.

Antone Honanie, a Hopi practitioner, testified that he would have difficulty preparing for religious ceremonies, because

treated sewage effluent is "something you can't get out of your mind when you're sitting there praying" to the mountain, "a place where everything is supposed to be pure." Emory Sekaquaptewa, a Hopi tribal member and research anthropologist, testified that the desecration of the mountain would cause *Katsinam* dance ceremonies to lose their religious value. They would "simply be a performance for performance['s] sake" rather than "a religious effort": "Hopi people are raised in this belief that the mountains are a revered place. And even though they begin with kind of a fantasy notion, this continues to grow into a more deeper spiritual sense of the mountain. So that any thing that interrupts this perception, as they hold it, would tend to undermine the — the integrity in which they hold the mountain."

Summarizing the Hopi's testimony, the district court wrote:

> The individual Hopi's practice of the Hopi way permeates every part and every day of the individual's life from birth to death. . . . The Hopi Plaintiffs testified that the proposed upgrades to the Snowbowl have affected and will continue to negatively affect the way they think about the Peaks, the Kachina and themselves when preparing for any religious activity involving the Peaks and the Kachina — from daily morning prayers to the regular calendar of religious dances that occur throughout the year. . . . The Hopi Plaintiffs also testified that this negative effect on the practitioners' frames of mind due to the continued and increased desecration of the home of the Kachinas will undermine the Hopi faith and the Hopi way. According to the Hopi, the Snowbowl upgrades will undermine the Hopi faith in daily ceremonies and undermine the Hopi faith in their Kachina ceremonies as well as their faith in the blessings of life that they depend on the Kachina to bring.

408 F. Supp.2d at 894-95.

The Havasupai presented evidence that the presence of treated sewage effluent on the Peaks would, by contaminating the Peaks, undermine their sweat lodge purification ceremonies and could lead to the end of the ceremonies. Rex Tilousi, Chairman of the Havasupai, testified that Havasupai religious stories teach that the water in Havasu creek, which they use for their sweat ceremonies, flows from the Peaks, where the Havasupai believe life began. Although none of the three Havasupai witnesses stated that they would be completely unable to perform the sweat lodge ceremonies as a consequence of the impurity introduced by the treated sewage effluent, Roland Manakaja, a traditional practitioner, testified that the impurity would disrupt the ceremony:

> If I was to take the water to sprinkle the rocks to bring the breath of our ancestors — we believe the steam is the breath of our ancestors. And the rocks placed in the west signify where our ancestors go, the deceased. . . . Once the steam rises, like it does on the Peaks, the fog or the steam that comes off is creation. And once the steam comes off and it comes into our being, it purifies and cleanses us and we go to the level of trance. . . . It's going to impact mentally my spirituality. Every time I think about sprinkling that water on the rocks, I'm going to always think about this sewer that they're using to recharge the aquifer.

He further testified that he was "concerned" that the water's perceived impurity might cause the sweat lodge ceremony to die out altogether, if tribal members fear "breathing the organisms or the chemicals that may come off the steam."

C.   "Substantial Burden" on the "Exercise of Religion"

[3] To establish a prima facie case under RFRA, a plaintiff must show that the government's proposed action imposes a substantial burden on the plaintiff's ability to practice freely

his or her religion. *Guerrero*, 290 F.3d at 1222. Although the burden need not concern a religious practice that is "compelled by, or central to, a system of religious belief," 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A), the burden "must be more than an 'inconvenience,' " *Guerrero*, 290 F.3d at 1222 (quoting *Worldwide Church of God*, 227 F.3d at 1121). The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *Bryant*, 46 F.3d at 949 (quoting *Graham*, 822 F.2d at 850-51).

**[4]** The record supports the conclusion that the proposed use of treated sewage effluent on the San Francisco Peaks would impose a burden on the religious exercise of all four tribes discussed above — the Navajo, the Hopi, the Hualapai, and the Havasupai. However, on the record before us, that burden falls most heavily on the Navajo and the Hopi. The Forest Service itself wrote in the FEIS that the Peaks are the most sacred place of both the Navajo and the Hopi; that those tribes' religions have revolved around the Peaks for centuries; that their religious practices require pure natural resources from the Peaks; and that, because their religious beliefs dictate that the mountain be viewed as a whole living being, the treated sewage effluent would in their view contaminate the natural resources throughout the Peaks. Navajo Appellants presented evidence in the district court that, were the proposed action to go forward, contamination by the treated sewage effluent would prevent practitioners from making or rejuvenating medicine bundles, from making medicine, and from performing the Blessingway and healing ceremonies. Hopi Appellants presented evidence that, were the proposed action to go forward, contamination by the effluent would fundamentally undermine their entire system of belief and the associated practices of song, worship, and prayer, that depend on the purity of the Peaks, which is the source of rain and their livelihoods and the home of the *Katsinam* spirits.

**[5]** We conclude that Appellants have shown that the use of treated sewage effluent on the Peaks would impose a sub-

stantial burden on their exercise of religion. This showing is particularly strong for the Navajo and the Hopi. Because we hold that the Navajo and the Hopi have shown a substantial burden on their exercise of religion, we need not reach the somewhat closer question of whether the Hualapai and the Havasupai have also done so.

### D.  "Compelling Governmental Interest" and "Least Restrictive Means"

**[6]** The Forest Service and the Snowbowl argue that even if Appellants have shown a substantial burden on their religious exercise, approving the use of treated sewage effluent to make artificial snow at a commercial ski area is "in furtherance of a compelling governmental interest" and constitutes "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). "Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 534. "[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215.

The Supreme Court has recently emphasized that, even with respect to governmental interests of the highest order, a "categorical" or general assertion of a compelling interest is not sufficient. In *Gonzales v. O Centro Espirita Beneficente*, 126 S. Ct. 1211 (2006), the Court held under RFRA that the government's general interest in enforcing the Controlled Substances Act was insufficient to justify the substantial burden on religious exercise imposed on a small religious group by a ban on a South American hallucinogenic plant. *Id.* at 1220-21. The Court stated that it did not "doubt the general interest in promoting public health and safety . . . , but under RFRA invocation of such general interests, standing alone, is not enough." *Id.* at 1225. "[S]trict scrutiny 'at least requires

a case-by-case determination of the question, sensitive to the facts of each particular claim.' " *Id.* at 1221 (quoting *Smith*, 494 U.S. at 899 (O'Connor, J., concurring in the judgment)).

The Forest Service and the Snowbowl argued successfully in the district court, and argue here, that approving the use of treated sewage effluent to make artificial snow serves several compelling governmental interests. In the words of the district court, those compelling interests are: (1)"selecting the alternative that best achieves [the Forest Service's] multiple-use mandate under the National Forest Management Act," which includes "managing the public land for recreational uses such as skiing"; (2) protecting public safety by "authorizing upgrades at Snowbowl to ensure that users of the National Forest ski area have a safe experience"; and (3) complying with the Establishment Clause. 408 F. Supp. 2d at 906. The district court concluded that all three were compelling governmental interests and that approving the proposed action was "the least restrictive means for achieving [the government's] land management decision." *Id.* at 907. Before this court, the Forest Service argues that the first two interests are compelling. The Snowbowl argues that all three are compelling. We disagree. We take the proffered interests in turn.

**[7]** First, the Forest Service's interests in managing the forest for multiple uses, including recreational skiing, are, in the words of the Court in *O Centro Espirita*, "broadly formulated interests justifying the general applicability of government mandates" and are therefore insufficient on their own to meet RFRA's compelling interest test. 126 S. Ct. at 1220. Appellants argue that approving the proposed action serves the more particularized compelling interest in providing skiing at the Snowbowl, because the use of artificial snow will allow a more "reliable and consistent operating season" at one of the only two major ski areas in Arizona, where public demand for skiing and snowplay is strong. We are unwilling to hold that authorizing the use of artificial snow at an already functioning commercial ski area in order to expand and improve its facili-

ties, as well as to extend its ski season in dry years, is a governmental interest "of the highest order." *Yoder*, 406 U.S. at 215.

However, Appellees contend that the very survival of the Arizona Snowbowl as a commercial ski area depends on their being able to make artificial snow with treated sewage effluent. They point to the district court's statement that "the evidence adduced at trial demonstrates that snowmaking is needed to maintain the viability of the Snowbowl as a public recreational resource." 408 F. Supp. 2d at 907. The record does not support the conclusion that the Snowbowl will necessarily cease to exist as a ski area if the proposed expansion does not go forward. As we noted above, there were two very dry years in 1995-96 and 2001-02. But in other recent years there has been heavy snowfall, particularly in 1991-91, 1992-93, 1997-98, and 2004-05. Relying only on natural snowfall, the Snowbowl has been in operation since 1938, and it undertook a substantial expansion in 1979. The current owners purchased the Snowbowl in 1992 for $4 million and now seek approval for another substantial expansion. It is clear that the current owners expect that the resort would be substantially more profitable — and the income stream more consistent — if the expansion were allowed to proceed. But the evidence in the record does not support a conclusion that the Snowbowl will necessarily go out of business if it is required to continue to rely on natural snow and to remain a relatively small, low-key resort. The current owners may or may not decide to continue their ownership. But a sale by the current owners is not the same thing as the closure of the Snowbowl.

Even if there is a substantial threat that the Snowbowl will close entirely as a commercial ski area, we are not convinced that there is a compelling *governmental* interest in allowing the Snowbowl to make artificial snow from treated sewage effluent to avoid that result. We are struck by the obvious fact that the Peaks are located in a desert. It is (and always has been) predictable that some winters will be dry. The then-

owners of the Snowbowl knew this when they expanded the Snowbowl in 1979, and the current owners knew this when they purchased it in 1992. The current owners now propose to change these natural conditions by adding treated sewage effluent. Under some circumstances, such a proposal might be permissible or even desirable. But in this case, we cannot conclude that authorizing the proposed use of treated sewage effluent is justified by a compelling governmental interest in providing public recreation. Even without the proposed expansion of the Snowbowl, members of the public will continue to enjoy many recreational activities on the Peaks. Such activities include the downhill skiing that is now available at the Snowbowl. Even if the Snowbowl were to close (which we think is highly unlikely), continuing recreational activities on the Peaks would include "motorcross, mountain biking, horseback riding, hiking and camping," as well as other snow-related activities such as cross-country skiing, snowshoeing, and snowplay. 408 F. Supp. 2d at 884.

**[8]** Second, although the Forest Service undoubtedly has a general interest in ensuring public safety on federal lands, there has been no showing that approving the proposed action advances that interest. Appellees provide no specific evidence that skiing at the Snowbowl in its current state is unsafe. We do recognize that there is a legitimate safety concern about snowplay by non-skiers who drive to the Peaks and park beside the road. The district court found that such snowplay next to the road has caused "injuries, traffic management issues, garbage, and sanitation problems." *Id*. at 899. The court further found that the proposed action would address the problem by creating an off-road managed snowplay area as part of the Snowbowl complex. *Id*. But this safety concern is not a compelling interest that can justify the burden imposed by the Snowbowl's expansion. The current dangerous conditions caused by snowplay do not result from the operation of the Snowbowl. These conditions are not caused by skiers, but rather by non-skiers who have stopped along the road. The Snowbowl's proposed expansion and the creation of a snow-

play area at the Snowbowl have become linked only because the Forest Service insisted in the negotiations leading to the FEIS that, in return for approval of the proposed action, the Snowbowl agrees to create a snowplay area for non-skiers. Even assuming that the safety concerns motivating the creation of the snowplay area are a compelling interest, we do not agree that inducing a commercial ski resort, which is not the source of the danger, to develop a snowplay area as a quid pro quo for approval of the resort's use of treated sewage effluent is the least restrictive means of furthering that interest.

**[9]** Third, approving the proposed action does not serve a compelling governmental interest in avoiding conflict with the Establishment Clause. The Supreme Court has repeatedly held that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). "Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause." *Id.* (citations omitted); *see also Hobbie v. Unemp. App. Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."). Declining to allow a commercial ski resort in a national forest to put treated sewage effluent on a sacred mountain is an accommodation that, in our view, falls far short of an Establishment Clause violation. Indeed, the Forest Service does not argue that avoiding a conflict with the Establishment Clause is a compelling interest served by the proposed action. Only the Snowbowl makes that argument.

In support of its argument, the Snowbowl cites *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), in which the Supreme Court struck down a statute allowing all Sabbath observers "an absolute and unqualified right not to work on whatever day they designate as their Sabbath," because the

law's primary effect was to advance religion by "impos[ing] on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee by enforcing observance of the Sabbath the employee unilaterally designates." *Id*. at 709. The Snowbowl argues that holding for Appellants would absolutely privilege Appellants' religious beliefs and practices over all other interests. This is not the case.

The district court found, and the evidence in the record supports, that Appellants believe that "the presence of the Snowbowl desecrates the mountain," regardless of the use of treated sewage effluent. Indeed, representatives of several of the tribes brought an unsuccessful First Amendment Free Exercise challenge to the 1979 expansion of the Snowbowl on that basis. *Wilson v. Block*, 708 F.2d 735, 739-45 (D.C. Cir. 1983). In Appellants' view, the proposed action, including the use of treated sewage effluent, would only "*further* desecrate their sacred mountain." 408 F. Supp. 2d at 888 (emphasis added). Absolutely valuing Appellants' religious beliefs over all other interests would require shutting down the existing operation of the Snowbowl — an option that was not considered as one of the three main alternatives in the FEIS and is not now sought by Appellants. In our view, declining to authorize the use of treated sewage effluent on the Peaks does not absolutely vindicate Appellants' interests. Rather, such a refusal is a permitted accommodation to avoid "callous indifference." *Lynch*, 465 U.S. at 673.

**[10]** We therefore hold that Appellees have not demonstrated that approving the proposed action serves a compelling governmental interest by the least restrictive means.

### E.   *Lyng v. Northwest Indian Cemetery Protection Association*

Appellees rely heavily on perceived similarities between this case and *Lyng v. Northwest Indian Cemetery Assoc'n*,

485 U.S. 439 (1988), to argue that the proposed action does not violate RFRA. In *Lyng*, the Forest Service sought to build a six-mile section of road connecting two pre-existing roads in the Chimney Rock area of the Six Rivers National Forest in northern California. *Id.* at 442. This area had historically been used by several Indian tribes for religious purposes. The route selected for the road was "removed as far as possible from the sites used by contemporary Indians for specific spiritual activities." *Id.* at 443. "Alternative routes . . . were rejected because they would have required the acquisition of private land, had serious soil stability problems, and would in any event have traversed areas having ritualistic value to American Indians." *Id.*

**[11]** Plaintiffs, including an Indian organization and several individual tribal members, challenged the proposed road under the Free Exercise Clause of the First Amendment, contending that their religious practices required use of undisturbed "prayer seats" in the Chimney Rock area. *Id.* at 443, 453. In their words, " 'Prayer seats are oriented so there is an unobstructed view, and the practitioner must be surrounded by *undisturbed* naturalness.' " *Id.* at 453 (emphasis added by the Court). The Court was willing to "assume that the threat to the efficacy of at least some religious practices [posed by the proposed road] is extremely grave." *Id.* at 451. The Court nonetheless held that building the proposed road did not violate the Free Exercise Clause. In the Court's view, there was no principled basis for distinguishing the plaintiffs' suit from a suit in which tribal members "might seek to exclude all human activity but their own from sacred areas of the public lands." *Id.* at 452-53.

**[12]** For two reasons, *Lyng* does not control the result in this case. First, the plaintiffs' challenge in *Lyng* was brought directly under the Free Exercise Clause. As we discuss, *supra*, the standard that must be satisfied to justify a burden on the exercise of religion under RFRA is significantly more demanding than the standard under the Free Exercise Clause.

Most importantly, "exercise of religion" is defined more broadly under RFRA than "free exercise" under the First Amendment. Further, the test for a prima facie case under RFRA is whether there is a "substantial burden" on the exercise of religion, whereas the traditional test under the First Amendment is whether free exercise is "prohibited." Finally, RFRA adds a "least restrictive means" requirement to the traditional compelling governmental interest test under the Free Exercise Clause. The net effect of these changes is that it is easier for a plaintiff to prevail in a RFRA case than in a pure free exercise case.

**[13]** Second, the facts in *Lyng* were materially different from those in this case. In *Lyng*, the Court was unable to distinguish the plaintiffs' claim from one that would have required the wholesale exclusion of non-Indians from the land in question. Further, the government had made significant efforts to reduce the burden, locating the planned road so as to reduce as much as possible its auditory and visual impacts. The Court wrote, "Except for abandoning its project entirely, and thereby leaving the two existing segments of road to dead-end in the middle of a National Forest, it is difficult to see how the Government could have been more solicitous." *Id.* at 454. Finally, the failure to build the six-mile segment of road would have left the unconnected portions of the road virtually useless.

**[14]** By contrast, Appellants in this case do not seek to prevent use of the Peaks by others. A developed commercial ski area already exists, and Appellants do not seek to interfere with its current operation. There are many other recreational uses of the Peaks, with which Appellants also do not seek to interfere. Far from "seek[ing] to exclude all human activity but their own from sacred areas of the public lands," *id.* at 542-53, Appellants in this case are not seeking to exclude any of the extensive human activity that now takes place on the Peaks. The currently proposed expansion of the Snowbowl may reasonably be seen as part of a continuing course of

development begun in 1938 and continued in 1979. The equivalent in this case to "abandoning the project entirely" in *Lyng* would be abandoning the ski area altogether. The equivalent of the Forest Service's minimizing the adverse impact of the road in *Lyng* by carefully choosing its location would be minimizing the adverse impact of the Snowbowl by restricting its operation to that which can be sustained by natural snowfall.

The record in this case establishes the religious importance of the Peaks to the Appellant tribes who live around it. From time immemorial, they have relied on the Peaks, and the purity of the Peaks' water, as an integral part of their religious beliefs. The Forest Service and the Snowbowl now propose to put treated sewage effluent on the Peaks. To get some sense of equivalence, it may be useful to imagine the effect on Christian beliefs and practices — and the imposition that Christians would experience — if the government were to require that baptisms be carried out with "reclaimed water."

[15] The Court in *Lyng* denied the Free Exercise claim in part because it could not see a stopping place. We uphold the RFRA claim in this case in part because otherwise we cannot see a starting place. If Appellants do not have a valid RFRA claim in this case, we are unable to see how any Native American plaintiff can ever have a successful RFRA claim based on beliefs and practices tied to land that they hold sacred.

F.   Conclusion

[16] For the foregoing reasons, we conclude that Appellants prevail on their RFRA claim.

**Volume 2 of 2**

### IV.　National Environmental Policy Act

The National Environmental Protection Act requires federal agencies to prepare a detailed environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Appellants assert five NEPA claims. We hold that only the first of them merits reversal. We consider each in turn.

### A.　Human Ingestion of Snow Made from Treated Sewage Effluent

The Navajo Nation, the White Mountain Apache Tribe, the Yavapai-Apache Tribe, the Havasupai Tribe, Rex Tilousi, Dianna Uqualla, the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network ("Navajo Appellants" or "Appellants") claim that the FEIS failed to consider adequately the risks posed by human ingestion of artificial snow made from treated sewage effluent.

#### 1.　Administrative Exhaustion and Notice of Claim in the District Court

We begin by addressing Appellees' argument that we should not reach the merits of this claim. Appellees argue that Appellants failed to exhaust the claim in administrative proceedings as required by the APA, 5 U.S.C. § 704, and that Appellants failed to raise it in the district court. We conclude that Appellants sufficiently raised the claim in comments on the draft EIS and in their administrative appeals, and that they properly raised it in the district court.

We have interpreted the NEPA exhaustion requirements leniently because "[r]equiring more might unduly burden those who pursue administrative appeals unrepresented by counsel, who may frame their claims in non-legal terms." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002). "The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Id.* at 899; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (plaintiffs' participation must " 'alert[ ] the agency to the parties' position and contentions,' in order to allow the agency to give the issue meaningful consideration" (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). "Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). The aim is to prevent plaintiffs from engaging in "unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.' " *Vt. Yankee*, 435 U.S. at 553-54.

The core of Appellants' claim is that the FEIS has insufficiently analyzed the risk of ingestion — particularly by children — of artificial snow made from treated sewage effluent. This risk was evident to the Forest Service from the beginning. At least from the standpoint of public relations, the Service responded to the risk at a very early stage. In October 2002, even before the draft EIS was published, the Service wrote what it called a "strategic talking point." The "talking point" began with the question: "Will my kids get sick if they eat artificial snow made from treated wastewater?" It contin-

ued with a scripted answer: "[T]his question is really one that will be thoroughly answered in the NEPA analysis process." As we discuss below, the question was *not* subsequently "thoroughly answered in the NEPA analysis process."

**[17]** Appellants were among those who raised this issue, both in comments on the draft EIS and in administrative appeals. One member of both the Sierra Club and the Flagstaff Activist Network commented that "we'll be dealing with treated sewage that is undiluted with fresh water and people who will be falling in great frozen piles of the stuff and probably accidentally swallowing some. Not to speak of children and even adults who indulge in the winter tradition of eating snow." A member of the Sierra Club and the Center for Biological Diversity noted that "various disturbing trends have led researchers to believe that environmental exposures are contributing to children's declining health status": "If concerns about wildlife and adult human health are not sufficient to justify prudence in the further contamination of the northern Arizona Ecosystems and waters with various societal chemicals, then perhaps concerns for child health might dictate a more conservative approach."

Further, the Navajo Nation, the Sierra Club, the Flagstaff Activist Network, the Center for Biological Diversity, and the Hualapai Tribe objected in their administrative appeal:

> The Forest Service never asked for interagency consultation on this matter from any substantial government authority including the National Institute of Child Health . . . . Children respond very differently from adults to drugs and pollutants. Moreover, different genetic make-ups respond differently to drugs and chemicals. No data at all exist on the long-term effects of reclaimed water pollutants on two major populations that can be impacted by the "preferred alternative," children and Native Americans.

In their administrative appeal, the Havasupai protested that "[k]ids and skiers will be getting a mouthful of [the water]."

**[18]** These comments and appeals were more than sufficient to put the Forest Service on notice of the claim and to exhaust Appellants' administrative remedies. The Forest Service was obviously aware, from the outset of the NEPA process, of possible health risks from human ingestion of artificial snow made from treated sewage effluent, and Appellants were among those who gave the Service reason to address the issue.

The Appellants' complaint in the district court satisfied the notice pleading requirement of Federal Rule of Civil Procedure 8(a)(2) with respect to the risk of ingesting snow, and the risk to children was specifically briefed in the district court at summary judgment.

## 2. Merits

**[19]** "NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quoting *Robertson*, 490 U.S. at 350). Regulations require that an EIS discuss environmental impacts "in proportion to their significance." 40 C.F.R. § 1502.2(b). For impacts discussed only briefly, there should be "enough discussion to show why more study is not warranted." *Id.*

We employ a " 'rule of reason [standard] to determine whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (first alteration in original) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)). In reviewing an EIS, a court

must not substitute its judgment for that of the agency, but rather must uphold the agency decision as long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953-54 (9th Cir. 2003) (quoting *Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir. 1990)). This standard consists of "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).

The treated sewage effluent proposed for use in making artificial snow meets ADEQ standards for what Arizona calls "A+ reclaimed water." The ADEQ permits use of A+ reclaimed water for snowmaking, but it has specifically disapproved human ingestion of such water. Arizona law requires users of reclaimed water to "place and maintain signage at locations [where the water is used] so the public is informed that reclaimed water is in use and that no one should drink from the system." Ariz. Admin. Code § R18-9-704(H) (2005). Human consumption, "full-immersion water activity with a potential of ingestion," and "evaporative cooling or misting" are all prohibited. *Id.* § R18-9-704(G)(2). Irrigation users must employ "application methods that reasonably preclude human contact," including preventing "contact with drinking fountains, water coolers, or eating areas," and preventing the treated effluent from "standing on open access areas during normal periods of use." *Id.* § R18-9-704(F).

We conclude that the FEIS does not contain a reasonably thorough discussion of the risks posed by possible human ingestion of artificial snow made from treated sewage effluent, and does not articulate why such discussion is unnecessary.

The main body of the FEIS addresses the health implications of using treated sewage effluent in subchapter 3H, "Wa-

tershed Resources." Much of the subchapter's analysis focuses on the "hydrogeologic setting" and on the effect of the artificial snow once it has melted. The part of the subchapter describing the treated sewage effluent acknowledges that its risks to human health are not well known because it contains unregulated contaminants in amounts not ordinarily found in drinking water, including prescription drugs and chemicals from personal care products. The subchapter contains tables listing the amounts of various organic and inorganic chemical constituents that have been measured in the treated sewage effluent. One table gives a partial comparison of Flagstaff's monitoring data on the treated sewage effluent to the national drinking water standards, showing that Flagstaff has not measured thirteen of the regulated contaminants and has not measured five of them with sufficient precision to determine whether the treated sewage effluent meets the standards. However, the FEIS does not go on to discuss either the health risks resulting from ingestion of the treated sewage effluent, or the likelihood that humans — either adults or children — will in fact ingest the artificial snow.

Instead, the environmental impact analysis in subchapter 3H, the only part of the FEIS to discuss the characteristics of treated sewage effluent, addresses only the impact on the watersheds and aquifers. That analysis assesses the treated sewage effluent's impact after it has filtered through the ground, a process the FEIS estimates may result in "an order of magnitude decrease in concentration of solutes." Thus, although the subchapter reasonably discusses the human health risks to downgradient users, it does not address the risks entailed in humans' direct exposure to, and possible ingestion of, undiluted treated sewage effluent that has not yet filtered through the ground.

Appellees direct our attention to five responses to comments on the draft EIS, contained in the second volume of the FEIS. None of these brief responses constitutes a reasonable discussion of the issue, nor does any response articulate why

such a discussion is unnecessary. The first response, objecting to a commenter's use of the word "sewage" in advocating a "sewage-free natural environment," notes that groundwater tainted by effluent in southern California has not been shown to have had adverse human health effects. That response does not address the risk posed by this project: that is, direct exposure to, and possible ingestion of, snow made from undiluted treated sewage effluent.

A second response purports to answer a question about who would bear liability for illnesses caused by the treated sewage effluent. The response states that the treated sewage effluent is "very strictly controlled," "acceptable for unrestricted body contact," and "authorized for artificial snowmaking for skiing by ADEQ." Not only does the response fail to answer the liability question posed; the response also fails to address the fact that the ADEQ has specifically disapproved human ingestion of treated sewage effluent.

The third response is to a question about why warning signs are necessary if the reclaimed water is not harmful. The FEIS states, hypothetically: "The extent to which reclaimed water is or is not a human health and safety concern would depend on many factors . . . . Poorly or partially treated wastewater could give rise to infectious disease. On the other hand, it is technically and economically feasible to treat wastewater to acceptable drinking water quality." As above, this is a non-responsive answer. While it may be true that "it is technically and economically feasible" to treat wastewater to the point where it meets drinking water standards, the fact in this case is that the treated sewage effluent proposed for use is *not* treated to meet standards for potable water. The FEIS then explains that the signs are required under Arizona law: "In direct response to the comment, it should be realized that there are many sites in Arizona where a lower quality of reclaimed water is used for irrigation. The law protects the public (e.g., golfers and farm workers) in the hot desert regions that might otherwise believe the water is potable."

This response does not address the risk that children or adults might also think the snow may be ingested. Further, in referring to the need to guard against ingestion of "lower quality" reclaimed water, the answer implies (incorrectly) that the artificial snow would be made of potable water.

The fourth response follows three combined questions: (1) whether signs would be posted to warn that "reclaimed water" has been used to make the artificial snow; (2) how much exposure to the snow would be sufficient to make a person ill; and (3) how long it would take to see adverse effects on plants and animals downstream. The response to these questions is four sentences long. It states that signs would be posted, but it does not say how numerous or how large the signs would be. It then summarizes the treatment the sewage would undergo. The final sentence asserts: "In terms of microbiological and chemical water quality, the proposed use of reclaimed water for snowmaking represents a low risk of acute or chronic adverse environmental impact to plants, wildlife, and humans." The response does not answer the specific and highly relevant question: How much direct exposure to the artificial snow is safe? Nor does the response provide any analysis of the extent of the likely "exposure," including the likelihood that children or adults would accidentally or intentionally ingest the snow made from non-potable treated sewage effluent.

The fifth response is on the last page of responses to comments. The Forest Service in its brief does not call attention to this response, perhaps because the Service recognizes its inadequacy. The questions and response are:

> **In areas where reclaimed water is presently used, there are signs posted to warn against consumption of the water. Will these signs be posted at the Snowbowl? If so, how will that keep children from putting snow in there [sic] mouths or acci-**

> **dentally consuming the snow in the case of a wreck?**
>
> There will be signs posted at Snowbowl informing visitors of the use of reclaimed water as a snowmaking water source. Much like areas of Flagstaff where reclaimed water is used, it is the responsibility of the visitor or the minor's guardian to avoid consuming snow made with reclaimed water. It is important to note that machine-produced snow would be mixed and therefore diluted with natural snow decreasing the percentage of machine-produced snow within the snowpack. *Because ADEQ approved the use of reclaimed water, it is assumed different types of incidental contact that could potentially occur from use of class A reclaimed water for snowmaking were fully considered.*

(Emphasis added.)

There are several problems with this response. First, the response does not assess the risk that children will eat the artificial snow. Stating that it is the parents' responsibility to prevent their children from doing so neither responds to the question whether signs would prevent children from eating snow, nor addresses whether ingesting artificial snow would be harmful. Second, the Forest Service's assumption that the ADEQ's approval means the snow must be safe for ingestion is inconsistent with that same agency's regulations, which are designed to *prevent* human ingestion. Third, the assumption that the ADEQ actually analyzed the risk of skiers ingesting the treated sewage effluent snow is not supported by any evidence in the FEIS (or elsewhere in the administrative record). Finally, the Forest Service's answer is misleading in stating that the treated sewage effluent will be "diluted." The artificial snow would itself be made entirely from treated sewage effluent and would only be "mixed and therefore diluted" with natural snow insofar as the artificial snow intermingles

with a layer of natural snow. During a dry winter, there may be little or no natural snow with which to "dilute" the treated sewage effluent.

In addition to directing our attention to the responses above, Appellees further contend that the FEIS "sets forth relevant mitigation measures" to "the possibility that someone may ingest snow." Although Appellees do not specify the "relevant mitigation measures" to which they refer, the only mitigation measure mentioned in the FEIS is the requirement under Arizona law that the Snowbowl post signs "so the public is informed that reclaimed water is in use and that no one should drink from the system." Ariz. Admin. Code § R18-9-704(H) (2005). This "mitigation measure" is *not* listed along with the fifty-five mitigation measures catalogued in a table in the FEIS. *Cf.* 40 C.F.R. § 1502.14 (f) (requiring agencies to include "appropriate mitigation measures" in the EIS's description of the proposal and its alternatives). The measure's omission from the FEIS table is hardly surprising, however, given that the FEIS does not address as an environmental impact the risk to human health from the possible ingestion of artificial snow made from treated sewage effluent.

Our role in reviewing the FEIS under the APA is not to second-guess a determination by the Forest Service about whether artificial snow made from treated sewage effluent would be ingested and, if so, whether such ingestion would threaten human health. We are charged, rather, with evaluating whether the FEIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity*, 349 F.3d at 1166 (quotation marks omitted). An agency preparing an EIS is required to take a "hard look" that "[a]t the least . . . encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (citing

*Robertson*, 490 U.S. at 350 (stating that NEPA requires environmental costs to be "adequately identified and evaluated")). A proper NEPA analysis will "foster both informed decision-making and informed public participation." *Churchill*, 276 F.3d at 1071 (quoting *Block*, 690 F.2d at 761).

[20] We conclude that the Forest Service has not provided a "reasonably thorough discussion" of any risks posed by human ingestion of artificial snow made from treated sewage effluent or articulated why such a discussion is unnecessary, has not provided a "candid acknowledgment" of any such risks, and has not provided an analysis that will "foster both informed decision-making and informed public participation." We therefore hold that the FEIS does not satisfy NEPA with respect to the risks of ingesting artificial snow.

## B.   Consideration of Alternatives

Appellants Norris Nez, Bill "Bucky" Preston, and the Hualapai Tribe ("Hualapai Appellants" or "Appellants") claim that the Forest Service failed to consider a reasonable range of alternatives in the FEIS. They claim that the range of alternatives falls short because the Forest Service took actions that foreclosed considering other alternatives, and because the Service failed to consider the alternative of drilling for fresh water.

[21] NEPA provides that an EIS must contain a discussion of "alternatives to the proposed action," and that federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(C)(iii), (E). This requirement is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

Project alternatives derive from an EIS's "Purpose and Need" section, which briefly specifies "the underlying pur-

pose and need to which the agency is responding in proposing the alternatives including the proposed action." *Id.* § 1502.13. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Federal agencies must present the environmental impacts of the proposal in comparative form, "[r]igorously explore and objectively evaluate all reasonable alternatives," and "briefly discuss" the reasons for eliminating any alternatives from detailed study. 40 C.F.R. § 1502.14(a). "The rule of reason guides both the choice of alternatives as well as the extent to which the EIS must discuss each alternative." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004) (alteration and internal punctuation omitted).

The regulations further provide that "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f); *see also id.* § 1506.1. An EIS "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id.* § 1502.2(g). However, agencies shall also "[i]dentify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference." *Id.* § 1502.14(e). We have interpreted this regulation to mean that "an agency can formulate a proposal or even identify a preferred course of action before completing an EIS." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997).

The FEIS and ROD define the Proposed Action's "Purpose and Need" as follows:

> Purpose #1
> *To ensure a consistent and reliable operating season, thereby maintaining the economic viability of*

*the Snowbowl, and stabilizing employment levels
and winter tourism within the local community.*

*. . . .*

Purpose #2:
*To improve safety, skiing conditions, and recreational opportunities, bringing terrain and infrastructure into balance with current use levels.*

The district court upheld this statement of purpose and need because it responds to documented needs and because it fits with both the forest plan for the Coconino National Forest and the Forest Service's multiple-use mandate. 408 F. Supp. 2d at 873-74. Although Appellants note that an agency does not have unlimited discretion to define the purpose and need for a project, they do not appeal this ruling.

Rather, the Hualapai Appellants argue that certain pre-scoping memoranda and notes demonstrate that the Forest Service took actions that foreclosed the consideration of a reasonable range of alternatives. They largely base their argument on the scripted "Key Messages" contained in the Forest Service's June 2002 "Tribal Consultation Plan":

1. We [the Forest Service] think it's a good idea, and we already know you [tribes] don't approve of it, but Snowbowl is there & isn't going away.

. . . .

6.   Upgrade can't be done without snowmaking

7.   Recycled water IS clean, disease-free.

8.   How can YOU help US make it work ???

Appellants argue that another June 2002 talking points memorandum also supports the notion that the adoption of the pro-

posed action was predetermined, quoting part of the scripted response contained in the memorandum: "Once we accept the proposal, we DO support it . . . ." Further, they point to a note from a Forest Service meeting in August 2002, before the Snowbowl had officially submitted its proposal: "[W]e are all ambassadors of this [project] and need to provide the same messages."

Despite what these scripted responses written early in the process suggest, the balance of the administrative record sufficiently demonstrates that the Forest Service had not foreclosed all consideration of alternatives. Among the five "objectives" listed in the Tribal Consulation Plan are "Get ideas on possible mitigating measures" and "Are there any additional tribal concerns we don't already know about." The full sentence from the other talking points memorandum indicates that the Forest Service had not settled on any particular proposal: "Once we accept the proposal, we DO support it — That's why we want your input now so hopefully we can have a proposal we can all work with." The Forest Service was entitled to have in mind a preferred course of action in advance, *see Ass'n of Pub. Agency Customers*, 126 F.3d at 1185, and Appellants are unable to point to substantial evidence indicating that the Forest Service impermissibly "*commit*[*ted*] *resources* prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f) (emphasis added).

Appellants also argue that the Forest Service failed adequately to consider fresh water drilling as an alternative to the use of treated sewage effluent for snowmaking. The Forest Service (but not the Snowbowl) argues that the doctrine of exhaustion bars this claim because Appellants did not raise the issue during the comment period or in their administrative appeal. The record contradicts the Forest Service. In his administrative appeal, Appellant Preston argued that the FEIS was inadequate because "an alternative was suggested for the

use of freshwater instead of reclaimed water for snowmaking, but was summarily dismissed."

**[22]** Appellants concede that the FEIS briefly addresses multiple alternatives to using the treated sewage effluent. They object, however, that the Forest Service relied on the Snowbowl's studies on the feasibility of water alternatives without conducting sufficient independent investigation and without disclosing sufficient information to the public to challenge the Snowbowl's studies. They further argue that the Forest Service's "assertions regarding economic and technical difficulties are questionable given the exorbitantly high costs ($19,733,000) and the technical difficulty of the selected alternative." To the contrary, the fact the Snowbowl is apparently willing to incur such costs supports the Forest Service's conclusion that the alternative sources of water were not reasonable. In justifying its elimination of the potable water alternative, the Forest Service cited "logistical and economic considerations and water availability research," as well as "environmental and political issues." Appellants have not shown that a fresh water alternative was reasonable in the middle of the northern Arizona desert, and that the relatively brief treatment in the FEIS was therefore inadequate. Thus, although the Forest Service's discussion was indeed brief, Appellants have not shown that the discussion was inadequate under 40 C.F.R. § 1502.14(a).

## C.   Disclosure of Scientific Viewpoints

The Navajo Appellants claim that the Forest Service failed to discuss and consider adequately the scientific viewpoint of Dr. Paul Torrence. Dr. Torrence criticized the draft EIS for approving the proposal despite the risks posed by endocrine-disrupting chemicals present in treated sewage effluent.

**[23]** Regulations require an agency preparing an FEIS to "assess and consider comments both individually and collectively," to respond to the comments, and to state its responses

in the FEIS. 40 C.F.R. § 1503.4(a). Although the agency need not "set forth at full length the views with which it disagrees," *Block*, 690 F.2d at 773, the agency must "discuss at appropriate points in the [FEIS] any responsible opposing view which was not adequately discussed in the draft statement." 40 C.F.R. § 1502.9(b). Ordinarily, the agency must attach to the FEIS "all substantive comments . . . whether or not the comment is thought to merit individual discussion." *Id.* § 1503.4(b). However, if comments have been "exceptionally voluminous," summaries suffice. *Id.* Under some circumstances, an agency's response to a comment need not be given in the main body of the FEIS and may instead be contained in a separate "comments and responses" section. Those circumstances arise when "many of the critical comments prompted revisions in the body, [the agency] discussed in the body all of the environmental problems to which the comments were addressed, and [the agency] provided thoughtful and well-reasoned responses to most of the critical comments." *Ore. Natural Res. Council v. Marsh*, 832 F.2d 1489, 1498-99 (9th Cir. 1987) (as amended), *rev'd on other grounds,* 490 U.S. 360 (1989).

In *Center for Biological Diversity*, we held that an FEIS was inadequate because it failed "to disclose responsible scientific opposition to the conclusion upon which it [was] based." 349 F.3d at 1160. The FEIS in that case evaluated amendments to a forest management plan, prompted by the need to protect the habitat of the northern goshawk. *Id.* at 1160-61. The alternatives evaluated were all based upon the scientific conclusion that the birds were "habitat generalists." *Id.* at 1160. The agency received comments from multiple federal and state agencies citing studies indicating that the birds were not habitat generalists, and that therefore the proposed plans would be inadequate. *Id.* at 1162-63. The agency responded to the comments directly via letter, but did not disclose or respond to them specifically in the FEIS. *Id.* at 1161-62. Rather, the FEIS merely acknowledged in a summary comment that "[a] few commenters expressed concern that the

proposed standards and guidelines for the . . . northern gos-hawk are grossly inadequate to protect the birds," and responded that "[t]he guidelines have been developed over several years using the best information and scientific review available" and could "easily be updated through future amendments." *Id.* at 1163 (alterations in original, quotation marks omitted). We held that the Forest Service was required to disclose and respond to the comments in the FEIS itself, because the comments were undisputedly "responsible oppos-ing scientific viewpoints," and because the FEIS's recommen-dations undisputedly "rest[ed] upon the Service's habitat generalist conclusion." *Id.* at 1167.

The FEIS in this case is unlike the FEIS in *Center for Bio-logical Diversity*. The comments of Dr. Torrence alleged by Appellants to have been inadequately treated in the FEIS do not represent an undisclosed opposing viewpoint to which the Forest Service failed to respond openly in the FEIS. Appel-lants object to the district court's characterization of Dr. Tor-rence's comments as "all . . . variations of the same allegation: that the agency failed to fully consider the range of implications of endocrine disruptors." 408 F. Supp.2d at 877. They assert that Dr. Torrence's comments raise a broader set of issues that the FEIS fails to disclose and discuss. Yet the district court's characterization is accurate because Dr. Torrence's comments all concern endocrine disruptors.

**[24]** The FEIS discloses, discusses, and responds to the substance of Dr. Torrence's comments. The main body of the FEIS contains a subsection on endocrine disruptors that cites a range of research and discusses the growing scientific and governmental concern about their effects on wildlife, humans, and the environment. The FEIS also discloses and discusses studies done on endocrine disruptors in the treated sewage effluent proposed for use in this case. The FEIS contains a table listing the amounts of suspected disruptors measured in the water and briefly summarizes a study of its effect on vari-ous animals in experiments conducted by a Northern Arizona

University professor, Dr. Catherine Propper. The FEIS comments that the concentrations of the suspected endocrine disruptors are significantly lower in the Rio de Flag water than in other waste water also measured in the study, and that "the proposed use of reclaimed water for snowmaking . . . will not result in comparable environmental exposure as investigated by Dr. Propper." Thus, although the FEIS takes a more sanguine view of the risk than does Dr. Torrence, the main body of the FEIS discloses to the public, and makes clear that the Forest Service considered, the risk posed by endocrine disruptors.

### D.   Impact on the Regional Aquifer

The Navajo Appellants claim that the FEIS inadequately considers the environmental impact of diverting the treated sewage effluent from Flagstaff's regional aquifer. The Forest Service argues that this claim was not exhausted in the administrative process. We disagree. Several comments raised the issue of diverting water that would have gone into the regional aquifer, including a comment by the Center for Biodiversity and the Flagstaff Activist Network, as well as a lengthy analysis submitted by the Sierra Club. Appellants' administrative appeal explicitly incorporated and reasserted by reference the submissions of these organizations. Thus, "taken as a whole," their appeal "provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council*, 304 F.3d at 899.

On the merits, Appellants claim that the FEIS inadequately considers the environmental impact of diverting the treated sewage effluent wastewater from the aquifer. Currently, during the winter when there is little demand for "reclaimed water" for irrigation and other uses, the treated sewage effluent is pumped into the Rio de Flag, where it is diluted with fresh water and percolates into the underground regional aquifer. Much of the effluent used to make artificial snow would

eventually make its way back to the aquifer, but some water would be lost to sublimation and evaporation. The FEIS contains extensive analysis on the question of the impact of this water loss on the recharge of the regional aquifer; subchapter 3H, discussed above, is largely devoted to the subject.

Nevertheless, Appellants argue that the FEIS does not adequately address the cumulative impact on the aquifer caused by diverting the water. First, they argue that the analysis is inadequate because the FEIS states that the study area of the watershed analysis is limited to the Hart Prairie Watershed and the Agassiz Subwatershed, an area that does not include the location where the treatment plant discharges the treated sewage effluent into the Rio de Flag. Therefore, they argue, the analysis fails to consider the impact on the regional aquifer caused by diverting the effluent from the Rio de Flag. However, the analysis of environmental impacts is plainly not limited to the designated "study area." Immediately after describing the parameters of the "study area" for the watershed analysis, the FEIS identifies as one of the cumulative effects to be analyzed the "potential long-term effects on the regional aquifer from diversions of reclaimed water for snowmaking."

Second, Appellants argue that the FEIS is inadequate, because the Forest Service "refused" to consider the impact of the wastewater diversion. They point to two portions of the FEIS that do, indeed, disclaim responsibility for analyzing the impact on the regional aquifer. The FEIS states that, due to an Arizona Supreme Court decision holding that cities can sell wastewater, "the authority of the city to provide reclaimed water to the Snowbowl is not subject to decision by the Forest Service and is therefore not within the jurisdictional purview of this analysis." In the comments and responses portion of the FEIS, the Forest Service reiterates, "The City has the legal right to put the reclaimed water to any reasonable use they see fit and is the responsible entity to determine the most suitable and beneficial use of reclaimed water."

**[25]** Nevertheless, the FEIS contains some analysis of the environmental impact of the diversion on the regional aquifer. After stating that the issue "extends well beyond the scope of the EIS" and "is provided as general information but will not be specifically considered in selecting an alternative," the Forest Service provides a quantitative analysis concluding that the snowmaking would "result in an estimated net average reduction in groundwater recharge to the regional aquifer of . . . . slightly less than two percent of the City of Flagstaff's total annual water production." Ultimately, the FEIS concludes that the cumulative impact is "negligible for overall change in aquifer recharge." Despite the odd and backhanded way in which it is presented, we conclude that the analysis in the FEIS is a "reasonably thorough discussion" of the issue. *Ctr. for Biological Diversity*, 349 F.3d at 1166.

## E.   Social and Cultural Impacts

The Hopi Appellants argue that the FEIS inadequately analyzes the social and cultural impacts of the proposed action on the Hopi people. NEPA requires agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U.S.C. § 4332(2)(A). Agencies must "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." *Id*. § 4332(2)(B). Finally, agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." *Id*. § 4332(2)(C). The regulations define "human environment" broadly to "include the natural and physical environment and the relationship of people with that environment," and note that "[w]hen an [EIS] is prepared and economic or social and natural or physical environmental effects are interrelated, then the [EIS] will discuss all of these effects on the human envi-

ronment." 40 C.F.R. § 1508.14. The "effects" that should be discussed include "aesthetic, historic, cultural, economic, social, or health" effects, "whether direct, indirect, or cumulative." *Id.* § 1508.8.

**[26]** The FEIS addresses the "human environment" through lengthy discussions of the relationship of the Hopi and others to the San Francisco Peaks and the impact of the proposed action on those relationships. The FEIS acknowledges that "it is difficult to be precise in the analysis of the impact of the proposed undertaking on the cultural and religious systems on the Peaks, as much of the information stems from oral histories and a deep, underlying belief system of the indigenous peoples involved." Nevertheless, the FEIS makes clear that the Forest Service conducted an extensive analysis of the issue, drawing from existing literature and extensive consultation with the affected tribes. The FEIS describes at length the religious beliefs and practices of the Hopi and the Navajo and the "irretrievable impact" the proposal would likely have on those beliefs and practices. The Forest Service has thus satisfied its obligations under NEPA to discuss the effects of the proposed action on the human environment.

## F.    Conclusion

For the foregoing reasons, we hold that the FEIS was inadequate with respect to its discussion of the risks posed by possible human ingestion of artificial snow made from treated sewage effluent. We hold that the FEIS was adequate in the four other respects challenged.

## V.    National Historic Preservation Act

**[27]** If a proposed undertaking will have an effect on historic properties to which Indian tribes attach religious and cultural significance, the National Historic Preservation Act ("NHPA") requires the federal agency to consult with the affected tribes before proceeding. *See* 16 U.S.C.

§§ 470a(d)(6), 470f; 36 C.F.R. §§ 800.1 *et seq.* Under NHPA regulations, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them." 36 C.F.R. § 800.16(f).

The Hopi Appellants argue that the Forest Service did not meaningfully consult with them. They concede that the Forest Service "sought tribal consultation on the religious and cultural significance of the Peaks, and provided a reasonable opportunity for the tribes to participate in the process," but they assert that those consultations were meaningless because the Forest Service prejudged the matter.

The evidence proffered by the Hopi Appellants does not support their claim. Their primary evidence is a letter from the Forest Service to the tribe. The Hopi Appellants contend that the letter shows that the proposal ultimately approved in the FEIS was preordained. The letter informs the Hopi that the owner of the Snowbowl is working on a draft proposal, states that the Forest Service believes the Hopi should be involved in the development of this proposal, and asks for input on "how the interests and concerns of the Hopi people might best be addressed" before the Forest Service accepts the proposal.

The Hopi Appellants specifically object to the following paragraph in the letter:

> The proposed development of the Arizona Snowbowl was the subject of a bitter lawsuit in 1981. Hopefully by involving the Hopi Tribe in planning the development this time, we can all avoid expensive and time-consuming litigation. However, the result of the 1981 lawsuit was a legal decision that allows the development of the Arizona Snowbowl and the construction of a number of facilities. The Snowbowl now wishes to complete the development,

and it is important to stress that the scope of the pro-
posal, with a few exceptions, is within the concept
approved by the court decision. It is also important
to note that all facilities will stay within the permit-
ted area.

They argue that this letter "informed [them] at the outset that,
based on its incorrect reading of an earlier court decision
(apparently referring to *Wilson v. Block*, 708 F.2d 735 (D.C.
Cir. 1983)), the Forest Service had no discretion to disapprove
the development proposed by the Snowbowl, thus making the
Proposed Action a foregone conclusion."

The Hopi Appellants' interpretation misconstrues the For-
est Service's letter. The letter indicates that most but not all
of the proposal is within the scope of the 1979 decision — the
"few exceptions" include snowmaking. Hence the letter spe-
cifically notes that the Snowbowl intends to introduce new
components never addressed in *Wilson*, thus implying that the
Forest Service need not accept the proposal. This implication
is supported by the letter's suggestion that consultation might
avoid a court battle. Thus, while the Forest Service's letter
signals receptiveness to the Snowbowl's proposal, it does not
demonstrate that the Forest Service failed to meaningfully
consult with the Hopi.

**[28]** The Hopi also incorporate by reference the evidence
that the Hualapai presented in their argument discussed above
that the Forest Service took actions that foreclosed the consid-
eration of a reasonable range of alternatives. However,
because of the extensive record of consultation undertaken by
the Forest Service in this case, we agree with the district court
that "[a]lthough the consultation process did not end with a
decision the tribal leaders supported, this does not mean that
the Forest Service's consultation process was substantively
and procedurally inadequate." 408 F. Supp. 2d at 879 n.11;
*see also id.* at 879-80 & n.11 (describing the scope of the con-
sultations in detail).

## VI.    Conclusion

In sum, we reverse the district court on two grounds. First, we hold that the Forest Service's approval of the proposed expansion of the Snowbowl, including the use of treated sewage effluent to make artificial snow, violates RFRA. Second, we hold that the Forest Service's FEIS does not fulfil its obligations under NEPA because it neither reasonably discusses the risks posed by the possibility of human ingestion of artificial snow made from treated sewage effluent nor articulates why such discussion is unnecessary. We affirm the district court's grant of summary judgment on Appellants' remaining four NEPA claims and on their NHPA claim.

AFFIRMED    in    part,    REVERSED    in    part,    and REMANDED. The parties shall bear their own costs on appeal.